𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

HULL v. FIELDS & THOMAS.

August 7, 1882.

1. JURISDICTION—*Annulment of conveyance—Case at bar.*—Under contract made in S county H executed deed conveying real estate therein situated, to F & T. Later, in the circuit court of that county, H brought suit against F & T to rescind the contract and vacate the deed. Summons was not served in that county on either of the defendants, both of whom resided elsewhere.

HELD:

> The suit was properly brought in S county under Code 1873, ch. 165, §1, clause 3, and §2.

2. FRAUD IN PROCUREMENT OF CONTRACT—*General rule.*—To rescind an executed contract of sale of property, on ground of false and fraudulent representations, there must have been false representation of material fact, constituting an inducement to the contract, whereon purchaser had a right to rely, and did rely, and was.thereby misled to his injury.

3. IDEM—*Sale of patent right—Case at bar.*—In 1878 F & T sold to H the exclusive privilege to sell in a certain territory a new and useful improvement, an *adding pencil*, patented in 1877. H conveyed to F & T real estate worth $1,800, and executed his bond for payment of $1,000 to F & T, when he should have sold to the extent of $5,000 by virtue of said privilege. As inducement to H to purchase the privilege, F & T made sundry representations and employed divers devices, which were relied on by H, and which he had a right to rely on, and which were false. Upon discovery of their falsity, H brought his bill to rescind the contract and annul the deed. F & T filed their demurrer and answer to the bill, and depositions were taken in the cause.

HELD:

> 1. The allegations in the bill showed sufficient grounds for rescinding the contract and vacating the conveyance.
>
> 2. The pleadings and evidence established the truth of those allegations, and entitle him to an annulment of the contract and deed.
>
> 3. When an exclusive right to vend an article is the thing sold, as in case here, the chief element of its value is the *salableness* of the

article, which depends, perhaps, not so much on the article, as respects its material and workmanship, as on how it takes with the public; and representations tending to impress the mind of the vendee with a idea of the popularity and salableness of the article, are material, and the vendee has a right to rely on them, and need not make further enquiry.

Appeal from decree of circuit court of Smyth county in the chancery suit of John N. Hull against C. C. Fields and D. G. Thomas. The object of the suit was to rescind a contract for the sale of a certain patent right by defendants to plaintiff, and to annul the deed conveying to them certain real estate in consideration therefor.

The contract was made, and the real estate was situated, in Smyth county. The defendants did not reside in that county, and the summons to answer the bill was not there served on them. The grounds alleged for vacating the contract and conveyance, were that defendants had induced plaintiff to purchase the exclusive right to vend within certain territory, "a new and useful instrument," called an "adding pencil," by false and fraudulent representations as to the *salableness* of the article, and other dishonest devices, to-wit: that the machinery necessary to manufacture the "adding pencil" required an out-lay of $3,500; that they had sold the cities of Memphis and New Orleans each for several thousand dollars; that pending the negotiations with plaintiff, they had sold to Mr. Wilmore, of Marion, seven counties in Virginia for $350; that Professor Peters had written Field a letter, which was exhibited and read to plaintiff, requesting Field to meet him in Marion, and that the writer, Peters, desired to purchase the right to said patent for England and Virginia; and that Fields employed an agent "*to work on*" plaintiff in order to get him to make the purchase. Also, that these representations were relied on by plaintiff, and induced him to enter into the contract; that they were false, and known to Fields to

be false when he made them, and that he made them with intent to defraud the plaintiff.

There were numerous depositions taken. The defendants demurred to the bill. The court below overruled the demurrer. They filed also their answer. At the hearing, the circuit court dismissed the bill at the plaintiff's costs, and he obtained an appeal to this court. The remaining facts and proceedings are fully stated in the opinion of the court.

————— for appellant.

*White & Buchanan,* for appellees.

ANDERSON, J., delivered the opinion of the court.

We are met at the threshold of this case with the objection that neither of the defendants were residing in the county of Smyth when the suit was brought, and that the process was not served on them in that county, and that the court below erred in overruling the motion to strike the cause from the docket. The suit was brought to rescind a contract which was made in the county of Smyth, between the plaintiff and defendants, and to annul the deed of conveyance which was made by the plaintiff to the defendants, of real estate situate in said county of Smyth, and to recover the same. We are of opinion that under the Code of 1873, ch. 165, the suit was properly brought in said county, and that the circuit court did not err in overruling the defendants' said motion.

. We are also of opinion that the court did not err in over-ruling the demurrer to the plaintiff's bill, which will appear from the view which we have taken of the case upon the merits.

To rescind an executed contract of the sale of property,

on the ground of false and fraudulent representations, there must have been, as a general rule, a false representation of a material fact, constituting an inducement to the contract, on which the purchaser had a right to rely, and did rely, and was misled to his injury. *Grim* v. *Byrd*, 32 Gratt. 293.

The bill of John N. Hull alleges that he was over-reached, swindled, and defrauded by the dishonest devices and misrepresentations of C. C. Fields, acting for himself, and D. G. Thomas as partners, who are made defendants, in the sale to him, of a so-called new and useful improvement, or *adding pencil,* for which Fields claimed to have received letters patent from the United States on the 6th of February, 1877; by which fraudulent devices and misrepresentations he, relying on them as true, was induced and became the purchaser of all the right, title, and interest of said Fields & Thomas in said pretended new and useful improvement, in and for the several counties, cities, towns, and corporations in the several States of North Carolina, Virginia, and Maryland, except seven counties of Virginia— namely: Washington, Russell, Buchanan, Lee, Scott, Tazewell, and Wise—for which he conveyed to said Fields & Thomas his lot on Main street, in the town of Marion, and store and dwelling-house, and other improvements thereon, worth not less than $1,800; and, in addition, executed to said Fields & Thomas his bond for $1,000, to be paid when he shall have sold to the extent of $5,000 in value by virtue of such purchases. The instrument sold to him by the said Fields & Thomas is thus described in the bill: A small circular brass or copper case, galvanized or plated, and containing but little or very cheap machinery, worked by a spring, and with pencil attachment, intended to register, by the use of figures, numbers added by the operation of the human mind—a specimen of which is exhibited with the bill, which seems to have been correctly described.

The bill further represents that the said Fields came to

Marion, where complainant resides, in August, 1878, and while there entered into a treaty with him for the sale of the States aforesaid, which lasted some two or three days, and during the treaty made false and fraudulent statements in regard to the subject matter of the contract, knowing them at the time to be false, intending thereby to cheat and defraud the plaintiff, which alleged false and fraudulent statements are then specifically charged by the bill.

We will now proceed to consider them *seriatim*, together with the responses of Fields' answer, and the proofs, and will then consider the question of their materiality.

First allegation. That Fields exhibited the instrument before described, and represented that the machinery necessary to manufacture them costs an outlay of $3,500.

The answer admits the sale to plaintiff, acting for himself and Thomas, of their interest in a certain patent invention called an "adding pencil," for the territory named in the bill, and for the consideration therein named, and that the negotiation was pending between them for two or three days. But "it is not true (respondent says) that said sale was induced or procured by fraud, or false and fraudulent representations; and all the allegations of fraud, and false and fraudulent representations are flatly denied."

He admits that it may be true that respondent told plaintiff that all the machinery necessary to manufacture said instrument would cost $3,500. This statement is true, and respondent believes that a larger sum will be required—possibly $5,000. That he made the representation is admitted, and the only question between them is as to its truth. What is the proof?

V. Doriot, a witness for defendants, testifies that he made 1,000 of said instruments for Fields & Thomas, and furnished all the material and received for them 50 cents apiece. He says further, that he did not make them with his ordinary appliances, but procured and made the ma-

chinery with which he manufactured them, which he thinks was of the value, including his own work, of $400. The allegation of the cost of such machinery is an affirmative allegation, and the proof of it devolved on the defendant. The proof does not sustain it, but rather disproves it.

Second allegation of misrepresentation. That he, Fields, had sold the cities of Memphis and New Orleans each for several thousand dollars.

The answer admits that respondent told the plaintiff that he had sold the city of Memphis, and says the statement is true; and that he had not only sold Memphis, but the whole State of Tennessee. But of these affirmative allegations he furnishes no proof. If they are true, he only could have proved it, and could easily have proved it, it is fair to presume, as the evidence is of course in his possession. But not having named the purchaser, the plaintiff had no means of proving the negative. He denies that he had sold Memphis at the price named in the bill, or that he had told plaintiff so. And he says it is not true that he said he had sold New Orleans at any price.

John N. Hull's deposition was taken, and he testifies that he told him he had sold the city of Memphis for $1,500, and the city of New Orleans for more than Memphis—somewhere between $1,500 and $2,500. Being asked on cross-examination—"Can you testify positively that Fields told you he had sold New Orleans before you closed your contract?" he answered—"Yes, sir; I can." His testimony is corroborated by E. J. Hallen, who testifies that Fields told him that he had sold the cities of Memphis and New Orleans, and had gotten for the former either $1,500 or $15,000, and for the latter either $2,500 or $75,000 (evidently a misprint for $25,000). The witness says he could not remember whether he said hundreds or thousands. Fields would have been a competent witness for himself, and that he did not testify and subject himself to cross-

examination, is a circumstance against him. There is other evidence corroborating the testimony of Hull on this point which we think overthrows the denial of the answer.

Third allegation. That pending the negotiation he told plaintiff he had sold to W. W. Wilmore, of Marion, at a large price ($350) the aforementioned seven counties excepted in Virginia.

The answer of Fields says, "it is not true that respondent represented to plaintiff that he had sold the seven counties reserved in the sale of the State of Virginia to W. W. Wilmore." Again he says, "There may have been some conversation between plaintiff and respondent as to said Wilmore wishing to buy said territory, but respondent denies that he made any such representation on this point as is stated in the bill."

It would seem from the deposition of Wilmore that he (Fields) was not warranted in representing to the plaintiff that Wilmore was wishing to purchase the seven counties, as he rather admits he might have done. Mr. Wilmore says he never purchased from him the right of said improvement in any of the counties of Virginia. He testifies that "when he first came here he proposed to sell me the State of Virginia; he kept after me until I finally told him it was no use in his fooling away his time with me, that I didn't want it. He said he had a letter from Col. Peters to meet him here at this place, and that he had disappointed him; and that if Peters was here he could sell the State to him for $1,500; that Peters and some one here—I think Rhea—wanted this State, and Peters and some professor at the University wanted England; and that if I would assist him in making the trade with Rhea, as Peters was not here, that he would give me $300 and seven of the back counties of Virginia, naming them. The matter dropped at that, and I had nothing more to do with him until I heard that he had made the trade with John Hull."

That don't look like Wilmore was working to purchase the said seven counties.

But did he tell Hull that he had sold the seven counties to Wilmore? John Hull testifies that he did. And W. W. Francis testifies that he heard him say, after he had negotiated with Hull and while the deeds were being drawn, that he had sold the said seven counties to W. W. Wilmore, and that John N. Hull was present in the room at the time. These two witnesses support the allegation in the bill, and overthrow the denial of the answer.

The fourth allegation of misrepresentation is, that Fields exhibited and read to complainant a letter, purporting to have been written to him by Professor Peters, requesting said Fields to meet him in Marion, and stating that he (Peters) desired to purchase the right to said patent for England and Virginia. This allegation is not denied by the answer, but is substantially admitted. He says expressly that he had had a conversation with Colonel Peters in regard to his purchasing said patent for England, Maryland, and Virginia, and he says Colonel Peters asked him not to make any disposition of said territory until he should come to Marion on Saturday. This was Tuesday or Wednesday. He admits that between those periods he had a conversation with plaintiff, in which he told him what Col. Peters had said.

Col. Peters testifies that he wrote to Fields to meet him in Marion, but what he exactly told him he can't recall. Certainly, he says, it could not have been that I wanted to purchase the right for England, for I am sure that in the conversation on the cars he told me that he had already disposed of the right for that country. It may have been that in my letter I alluded to this fact of his having disposed of his right to sell England. The defendant has not produced that letter in evidence.

Col. Peters says that on the cars between Abingdon and

Emory station, Fields showed him a calculator, and asked him to take an interest in it by purchasing the right for Virginia, or a part of Virginia. He stated that the right to sell other States, or parts of States—thinks he mentioned Louisiana—had been taken, and he showed what seemed to be highly flattering newspaper notices of the invention. He told him *he* could not attend to such a matter, but that he thought favorably of the invention, and that if his friend J. B. Rhea, of Marion, would undertake to look after it, he would *perhaps* make him an offer for the right to sell in Virginia or a part of Virginia, and would see him in Marion the following Saturday. On reaching Marion, he talked with Rhea and Capt. John P. Sheffey, and the result of the conversation was that he abandoned the idea of purchasing, and didn't call upon or seek an interview with Mr. Fields.

John N. Hull testifies that he told him that he had received a letter from Col. Peters stating that he did not want him to sell the territory of Virginia and part of Great Britain; that he would give $1,500 for Virginia, and probably would take part of Great Britain. But was certain that he would take Virginia. These representations are shown to be untrue by the deposition of Col. Peters. His impression was that he never at any time made any distinct offer of any amount whatever for this improvement. It seems that the representations he had made of his invention, and the success he had in selling rights for States and parts of States, and for England, and the flattering newspaper notices of it, had induced Col. Peters to think favorably of it, until he talked with his friend Rhea and Capt. John P. Sheffey about it. But he told Fields on the cars explicitly that he could not attend to such a matter, but that if his friend J. B. Rhea, of Marion, would undertake to look after it, that he would *perhaps* make him an offer for Virginia or a part of Virginia. It all depended

upon what Rhea thought of it, and Fields ought to have so understood it, and probably did. For there is abundant evidence in the record to show the devices and efforts he used to operate on Rhea before the day fixed for Col. Peters' arrival in Marion, to incline him to a favorable conclusion, which, it is a fair presumption, he knew had proved unsuccessful, before he plyed his contrivances and schemes to operate on Hull and to entrap him. Fields, in his answer, says that in the conversation with the plaintiff in which he told him what Peters said, that " he refused to hear a proposition from him until he, respondent, heard from Col. Peters." That statement is not responsive to any allegation in the bill. It is an affirmative allegation made for a purpose, which is obvious. But it can receive no weight unless it is proved. But the reverse is proved by the testimony of Hull. He testifies that the reason he assigned for selling to him at a less price than Col. Peters had offered him, was that he wanted plaintiff's property, because the storehouse would suit his business, and his wife wanted to come there to live. This shows that he had then offered to sell to plaintiff at a price which was less than he represented he had been offered by Col. Peters. At the time he was telling John Hull of the offers he had received from so distinguished a gentleman as Col. Peters, a professor of the University of Virginia, whose opinions on all subjects would have great weight with the people of Smyth county, where he was well known, or any where in Virginia, his purpose evidently was to induce Hull to make the trade, and he would hardly refuse to entertain any proposition from him. The testimony of F. W. Rider throws a flood of light upon this subject. He was well and doubtless familiarly acquainted with Fields. He knew him when he worked for Looke & Lincoln as a blacksmith, and when he carried on a blacksmith shop for Henderlite.

He was asked if he had had any conversation with Fields about the time he was trying to sell rights to his "adding pencil" for certain territory, &c.

He answers he had. "I asked him (he says) if he had got a bite yet, and he said he had got a nibble; that John Hull was nibbling at him. He said he had one agent here working on him, and he thought if he would do what he said he could, that he could get John Hull to bite. He said that he had told Hull that Col. Peters had offered him $50,000 for Great Britain and some of the States, and that he wished Peters would hurry and come here, for if Peters would come here he thought it would hurry John Hull up, and that he would go into the thing. He asked me if I could do anything with John Hull towards hurrying him up and get him into the trade. I told him I didn't think I could. I didn't know as I had any influence over John Hull at all. He said if some fellows around here that knew him would encourage John he thought he would go into it; that he thought that all that John Hull wanted to get him into it was a little encouragement."

This testimony shows that Fields was endeavoring and anxious to sell to John Hull, and was scheming to accomplish it. And it was before Col. Peters had come to Marion, he had been plying Rhea, as shown by the deposition of Mr. Wilmore. He had evidently found out that there was no chance to get Rhea to take hold, and that that was decisive that he would have nothing to expect from Col. Peters. Yet he goes to the plaintiff, knowing that if he was assured of the fact that Col. Peters regarded his invention so favorably that he was desirous of buying the right for Virginia, and had offered him $1,500 for it, and was also desirous of buying the right for England or Great Britain, that he would be apt te make the trade he proposed, and he deliberately makes these representations to him when he knew they were not true. He also repre-

sented to Hull that he visited New York city since the emanation of his patent, and that he had sold many of the instruments there, without leaving his hotel, at the price of $2.50 each, and that they were in great demand there, and of ready sale at that price.

These were not mere expressions of opinion in commendation of his property, *simplex commendatio*, which are allowable, and which men may innocently make in estimating the value of their property, though it may be extravagant in the opinion of others. It is generally the case that men put a high value upon their own property. And this being so universally the case, against such representations or expressions the rule of *caveat emptor* would reasonably apply.

Most of the foregoing representations were of facts, and not mere matters of opinion, and their materiality would depend upon their bearing upon the value of the thing, the right or privilege which was the subject of the sale, and whether the representations were of such a character, if true, to give value to that which was the subject of the sale, and be an inducement to one who believed them to be true to make the purchase. The materiality of the representation must depend, therefore, upon the nature or character of that which is the subject of the sale, in what its value consists. That may be illustrated by the case in hand.

The instrument called "adding pencil" is of little worth if estimated by the value of the material or the costliness of the workmanship. If A should purchase one for his own use, its value would depend upon the uses to which it may be applied—whether important and beneficial or not—and the efficiency with which it may be employed, and its adaptability to the ends proposed, and its durability. But when the exclusive right or privilege to sell the instrument over a certain district of country is the thing sold and conveyed, as in this case, the chief element of its value is the

salableness of the instrument, or of the exclusive privilege, which will depend in a great measure upon the salableness of the instrument; and that, perhaps, does not so much depend upon its value, in the sense before described, as upon how it takes with the public—how it is appreciated. It may be so constructed as that it may be employed with efficiency in accomplishing the ends proposed; but they may be regarded by the public as unimportant or trivial, or unnecessary, or not adapted to any important practical use, or for some other cause the public may regard it with indifference, or even with derision and contempt. The public may be wrong. It may have merits which the public don't see. They can't benefit the purchaser of the privilege in the right to sell. The people won't buy. And of what value is the privilege, or the right to sell an instrument which nobody will buy? The privilege is of no value. The invention may be ingenious, and the instrument may be skillfully constructed, and may be efficient to accomplish the ends proposed, but if the public regards those ends of no practical use or importance, and are indifferent to it, and nobody will buy it, the privilege is of no value to the purchaser.

Upon this view, all the representations of the defendant were more or less material and important; because, if true, they tended to show that the privilege was valuable, and presented strong inducements to the plaintiff to purchase. And being shown to be false, and that they were known to be false by the defendant when he made them, and should avoid the contract unless the representations were such that the plaintiff had no right to rely upon them, as contended by counsel for defendant, but ought to have made inquiry as to their truth. To some of the representations the plaintiffs might have made inquiry, as for instance, as to the sale represented to have been made to Wilmore. He might have inquired of Mr. Wilmore, who was on the

ground, whether it was true. As to most of the representations, he had no means of inquiring whether they were true or not. And it was not necessary in the case of Mr. Wilmore, according to principles declared by this court.

In *Brown* v. *Rice's Adm'r*, 26 Gratt. 473, the judge who delivered the opinion of the court says, "Again, it is argued that the defendant should not have relied upon these representations. She ought to have made further inquiry—she had the same means of information that the other party had. That she had the same means of information does not appear from the averments of the pleas. But if she might have had access to accurate information, it was not incumbent on her to make further inquiry. A man to whom a particular and distinct representation has been made, is entitled to rely on the representation, and need not make any further inquiry." "No man can complain that another has relied too implicitly on the truth of what he himself stated"—citing Kerr on Fraud and Mistakes, pp. 80–1.

The same principle in a recent English case has been positively affirmed by Lord Chelansford. He says, " When once it is established that there has been any fraudulent misrepresentation or willful concealment by which a person has been induced to enter into a contract, it is no answer to his claim to be relieved from it to tell that he might have known the truth by proper inquiry. He has a right to retort upon his objector, 'You at least, who have stated what is untrue, or have concealed the truth for the purpose of drawing me into a contract, cannot accuse me of want of caution, because I relied implicitly on your fairness and honesty.'" Pollock's Principles of Contract, p. 488 ; see also Pomeroy on Contracts, § 219.

We deem it unnecessary to consider the questions as to defects in the material and construction or workmanship of the instrument raised by plaintiff's amended bill. The

·contract was evidently a disastrous one to the plaintiff. What he got from the defendants was worth nothing to him, but involved him in a considerable expenditure of money, and loss of time, fruitlessly expended in endeavoring to make it available, and we think the record shows that the plaintiff was led into the contract by the false and fraudulent representations and devices of the defendant Fields, and that the same ought to be rescinded and the ·parties restored, as far as practicable, to their previous condition ; and that there is nothing in the subsequent declarations or conduct of the plaintiff, as shown in the record, which ought to deprive him of his right to such relief. The court is of opinion, therefore, to reverse the decree of the circuit court dismissing the plaintiff's bill with costs, and to enter such decree here as ought to have been made by the said circuit court.

DECREE REVERSED.