ADOLPH COHN

*v.*

MORRIS MITCHELL *et al.*

*Filed at Ottawa November 14, 1885.*

1. SPECIFIC PERFORMANCE—*discretion in granting relief.*   Courts of equity have large discretion in cases of specific performance; but such discretion is a judicial one, and subject to review when relief is denied in a case clearly within the general principles of equity jurisdiction.   It results from this that every case of specific performance depends in a great degree upon its own special circumstances.

2. SAME—*as to contracts relating to personal property.*   As a general rule a court of equity will not decree the specific performance of a contract

relating to personal property, unless there is some element or feature in it to show that the relief at law may not be adequate,—as, when the measure of damages resulting from the non-performance of the agreement is uncertain or difficult to ascertain, or when the thing contracted for has to the complainant some intrinsic or special value, and the like cases.

. 3. SAME—*of performance, or an offer to perform, as essential to the right to relief.* To entitle a party to relief by specific performance, he must show that he has performed, or at least offered to perform, the agreement on his part; and if an offer, only, is relied on, it must have been made within a reasonable time, or some sufficient excuse shown for not doing so.

4. In this case, several loans of money were made upon the security of certain shares of stock in a private corporation, hypothecated, by the borrower, under an agreement for a renewal of the notes given upon the same terms as the original. The borrower made no offer to renew the notes until the first one was about four months past due, and no new notes were prepared and tendered, and the only excuse for not making the tender was the fact that the notes for a part of the time were in the hands of another. It was *held*, that the borrower was not entitled to a decree for the specific performance of the agreement for renewal, and that the excuse for not tendering the renewal notes in proper time was not sufficient.

5. It was a further feature of the agreement, on the part of the borrower, in pledging his stock in the corporation, that he should pay the lender any dividends that might be declared thereon. It appeared that through his instrumentality, in part, the capital stock of the corporation was increased from $100,000 to $200,000, whereby the value of the stock was diminished to about half its former value, and that he applied his dividend of $1907.31 in the purchase of the new stock, instead of paying the same to the lender, and that he failed to tender renewal notes in a reasonable time after the maturity of the originals: *Held*, on bill by the borrower to enforce a specific performance of the agreement for renewal of the notes, that he was not entitled to the relief sought.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook County; the Hon. HENRY M. SHEPARD, Judge, presiding.

Messrs. G. W. & J. T. KRETZINGER, for the appellant:

A contemporaneous written agreement for renewing a note is binding on the parties, though detached from the note. 2 Parsons on Notes and Bills, 534, 538.

A bill lies for its specific enforcement. *McMullen* v. *Vanzant*, 73 Ill. 192.

The entry of judgment by confession upon the notes is no bar to the bill to enforce the agreement to renew the notes. *Carrington* v. *Halabird,* 17 Conn. 537; *Truett* v. *Wainwright,* 4 Gilm. 411; *Wista*v. *McManes,* 54 Pa. St. 327; *Broomley* v. *Holland,* 7 Ves. 3; 2 Bouvier's Law Dic. 467.

Messrs. Rosenthal & Pence, and Messrs. Abbott, Oliver & Showalter, for the appellees.

Mr. Chief Justice Mulkey delivered the opinion of the Court:

The above cases come to this court by appeal from the Appellate Court for the First District. Both grow out of the same state of facts, and will be considered in one opinion. They were brought by the appellant, Adolph Cohn, originally in the Superior Court of Cook county,—one on the law, and the other on the equity side of the court. The suit at law was brought against the appellee Morris Mitchell, alone, and the chancery suit against him and Seth F. Hanchett, as sheriff. Cohn was unsuccessful in both cases, in the trial as well as the Appellate Court.

It appears that on the 7th of June, 1883, Cohn and Mitchell entered into a written agreement by which the latter agreed to lend the former such sums of money as he might require, not to exceed $10,000. As a condition of the loan, Cohn was to subscribe for $20,000 of the capital stock of the American Varnish Manufacturing Company, which was then about to be organized, and in which Mitchell as well as Cohn proposed taking stock. The stock, when issued to Cohn, was to be deposited by him with Mitchell, as collateral security for the loans contemplated by the agreement, and they (the loans) were to be evidenced by judgment notes, each payable in one year from date, with interest at eight per cent per annum, payable semi-annually, and was to contain a recital showing that the stock was pledged for its payment, with power to

sell. It was further stipulated in said agreement, as follows : "The money so borrowed is to be paid solely to the corporation aforesaid, as installments on the stock subscribed by said Cohn. Said Mitchell binds himself to renew any or all the notes aforesaid on the terms aforesaid. It is further mutually agreed that said Cohn may at any time pay $500 or more on the said notes, or any of them, and have the same credited as he may direct. It is further agreed that all dividends declared on the said stock, during the outstanding of any of the said notes, shall be paid and credited thereon, provided that should any interest dividend be declared, such dividend is to be used in the payment of interest on the notes, at the option of said Cohn. Said notes are to be so drawn that no default in the payment of principal or interest can authorize a sale of the collateral except after the lapse of ninety days from and after such default."

The American Varnish Company was organized as contemplated, with a capital stock of $100,000, and Mitchell, pursuant to the agreement, advanced to Cohn the following sums of money, to-wit: August 1, 1883, $4000; September 24, 1883, $2000; November 1, 1883, $2000; December 27, 1883, $1000. Judgment notes were given by Cohn to Mitchell for the amount of these advances at the times they were respectively made, and in conformity with the agreement. It will be perceived that the first of these notes matured in August, 1884, and the last, December 27th of the same year. Cohn testifies that about the time the first note matured he learned that it was in the hands of one Samuels, and that he (Samuels) refused to renew the note; that he thereupon called on Oliver, the attorney of Mitchell, and told him that the transfer to Samuels was colorable only, and for the purpose of avoiding the performance of the above agreement. He further states that *immediately* after this interview with Oliver he received from him a note stating, "I did not see you Saturday, as requested. Mr. John Samuels informs me, under date of

November 20th, that he would consent to a renewal of the
note rather than involve Mitchell in a lawsuit, and Mitchell
has since told me that he has taken up the note from Samuels
and settled with him in full.    Mitchell was in to-day and de-
manded renewal of the past due notes forthwith, and I think
you had better attend to it at once, otherwise you are entirely
likely to lose your stock very soon."    This note from Oliver
bears date November 24, which was near four months after
the first note matured.

About the 4th of December Cohn called on Oliver, who
presented to him for his signature a renewal note, without
the clause in it prohibiting the sale of the stock securing it
except upon ninety days' notice, which Cohn refused to sign,
but, as claimed by him, offered to sign one with that clause
in it.    Nothing was done, however, and Cohn went off to
consult counsel.    On the 4th of December, J. T. Kretzinger,
as his attorney, called upon Oliver, for the purpose of reaching
an understanding and adjusting their differences.    Oliver in-
formed Kretzinger that Rosenthal & Pence had been retained
by Mitchell as counsel in the case, and that he had no doubt
the matter could be satisfactorily arranged, and, as claimed
by Cohn, agreed with Kretzinger that nothing should be done
until a full consultation was had between the parties and
their attorneys.

On the 5th, Oliver and Mitchell called on Kretzinger and
informed him that they understood the stock of the company
had been increased, thereby diminishing its value, and con-
sequently the security of the notes, and that if this were so,
he was not bound to renew them on the same terms.    Upon
this suggestion it was agreed that an examination should be
made as to the condition of the company, value of its stock,
etc., which was accordingly made on the same day.    From
the examination it appeared that on the 27th of September,
1884, at a meeting of the stockholders of the company the
following resolution was unanimously adopted:    "Resolved,

that the capital stock of the American Varnish Company be changed from one thousand shares at $100 each, or a capital of $100,000, to two thousand shares at $100 each, or a capital of $200,000, and that a stock dividend be declared from the accrued profits." And that in pursuance of this resolution, on the 3d of October following, a dividend of $12,036.55 was declared, $1907.31 of which was paid to Cohn on account of the stock held by him, which, instead of being paid by him on the notes held by Mitchell, as stipulated in the agreement, was invested by him in the new issue of stock at par value. Notwithstanding these developments, Mitchell and Oliver, as claimed by Cohn, expressed themselves satisfied with the condition of affairs, as the new stock seemed to be of par value, and another meeting was arranged for the 8th, at eleven o'clock A. M., with the understanding that nothing was to be done in the meantime by Mitchell.

On the morning of the 8th, Oliver wrote to Kretzinger as follows:

"*My Dear Sir*—I meant to have called this morning, but it could do no good, as your client is obdurate, and will make no concessions. Mr. Mitchell is now determined, in view of the opinion given him by his counsel, to push the matter with vigor. He therefore will take judgment against Cohn at once. I am sorry these matters could not have been amicably settled. Yours," etc.

This note was not received, however, until in the afternoon, but judgments, as therein indicated, were confessed that morning upon the three notes past due, amounting in the aggregate to $8457.80. Executions were issued upon these judgments, and were levied by the sheriff upon the stock securing the notes, and also on forty other shares of stock belonging to Cohn. Motions were thereupon made in the cases at law to vacate and set aside the judgments, which, upon a full hearing, the court declined to do, and its action

9—115 ILL.

was affirmed by the Appellate Court, as already stated. The appellant thereupon filed a bill on the equity side of the court, praying that the sheriff be enjoined from selling the stock levied upon, and that Mitchell be decreed to specifically perform the agreement. This suit also resulted adversely to Cohn, as already seen.

The above statement of facts is substantially that of Cohn himself, which is materially modified in one or two particulars by the statements of Mitchell and Oliver. Thus the latter testifies that before the maturity of the first note he told Cohn that it was in the hands of Samuels; that Cohn replied it was his intention to pay it; that this was repeated by him during the months of September and October; that it was not until some time in November that Cohn told him that he could not raise the money, and that the notes would have to be renewed; that previous to this time Mitchell had taken the notes back from Samuels. Mitchell also testifies that he learned for the first time on the 6th of December, 1884, that Cohn had subscribed for a part of the increased or watered stock, and that he had used his share of the October dividend in paying for the same. He, moreover, testifies that he was not served with notice, and that he had no knowledge of the stockholders' meeting at which the stock was increased and a dividend declared, until long after it occurred. He further says, that upon inquiry he found the watered stock was not worth over forty-five to fifty cents on the dollar.

Upon this simple narration of facts it is manifest, from whatever aspect considered, these cases have no merit in them. So far as the law case is concerned, that is practically abandoned on the argument. As to the chancery case, that stands on no better footing than the other, though counsel seems to have more confidence in it.

It is to be remarked, in the first place, courts of chancery have a large discretion in this class of cases. It is true it is a judicial discretion, and is therefore subject to review where

relief is denied in a case clearly brought within the general principles which control courts of equity in the exercise of this branch of their jurisdiction. A court of review, however, before interposing in any case must be able to say there has been an abuse of this discretion. It results from this general principle, that every case of specific performance must necessarily depend in a large degree upon its own special circumstances. (*Andrews* v. *Sullivan*, 2 Gilm. 327 ; *Fish* v. *Leser*, 69 Ill. 394 ; *Allen* v. *Woodruff*, 96 id. 11 ; *Radcliff* v. *Warrington*, 12 Ves. 332.) Again, the general rule clearly is, that a court of equity will not decree the specific performance of a contract relating to personal property unless there is some element or feature in it to show that the relief at law might not be adequate,—as, where the measure of damages resulting from the non-performance of the agreement is uncertain or difficult to ascertain, or where the thing contracted for has to the complainant some intrinsic or special value, and the like. The contract sought to be specifically enforced in this case is one relating solely to personal property. No special feature in the case has been suggested as authorizing the relief sought, and the only authority cited as supporting the theory of the bill is *McMullen et ux.* v. *Vanzant,* 73 Ill. 192. The statement cited by counsel from that case, to the effect "that the fact that an action at law would lie on the agreement sought to. be enforced was no reason why it might not be enforced in equity," is certainly true, and would hardly be denied by any one. The case, however, has but slight bearing, if any, on the one before us. There are two elements of equity jurisdiction that enter into that case that do not in this,—fraud and an express trust,—the latter alone being sufficient to warrant the decree.

We will not stop, however, to inquire whether there is any element or feature in this case from which it may fairly be inferred that a remedy at law will not afford adequate relief, and thus take it out of the general rule that a bill will not

ordinarily lie to enforce the specific performance of a contract relating to personal property, merely, for we shall place our decision on a different ground altogether. Nor is there any occasion to rest our conclusion on the defence of *res judicata*, which is relied on mainly by appellees. We prefer to place it, as we do, upon the broad ground that there is no equity in the case. Waiving all other questions, we think it clear the appellant is in no position to ask a specific performance of the agreement in question. Before one is entitled to relief of the kind sought, it must appear that he has either performed, or at least offered to perform, the agreement himself; and if an offer only is relied on, it must have been made within a reasonable time, or some sufficient excuse shown for not doing so. According to the plaintiff's own showing, no offer was ever made to renew the notes in question until the first one was about four months past due. As these notes matured it was the duty of Cohn to prepare new ones, and go and tender them. The fact that they were in the hands of Samuels for a part of the time was not at all in the way of making a tender. Persons having money loaned out, secured only by hypothecated stocks that may be valuable to-day and worth nothing to-morrow, as was the case here, do not want their loans represented by past due or dishonored paper. If a party liable on such paper has the right of renewal, he must promptly exercise it at the time of its maturity, or at least within a reasonable time thereafter. That was not done in this case, and no sufficient excuse is shown for the delay. But this is not all. It affirmatively appears that the increasing of the shares of stock from one thousand to two thousand was effected largely through the instrumentality of Cohn, in the absence and without the knowledge of Mitchell. This necessarily diminished the value of the stock pledged for the payment of the notes, and Mitchell, under the circumstances, was under no obligation to accept renewed notes secured by this watered stock at its face value, which Cohn finally pro-

posed to have him do. But even this is not all. Cohn was guilty of a palpable violation of his agreement with Mitchell, in not paying the $1907.31 stock dividend received by him on the notes in question, for which breach of duty not even the slightest excuse or justification has been shown.

The judgments of the Appellate Court in these cases are affirmed.

*Judgments affirmed.*