# CHARLESTON

CLEAVENGER *et al.* v. STURM *et al.*

Submitted February 27, 1906.   Decided April 24, 1906.

1.  SPECIFIC PERFORMANCE—*Executory Contract—Fraud.*
    An executory contract for the sale of land will not be specifically enforced in favor of a vendor who has made material fraudulent misrepresentations, upon which the vendee relied in making the contract. (p. 661.)

2.  SAME—*Cancellation of Contracts—Fraud.*
    Equity will rescind such contract where such relief is asked by the purchaser. (p. 667.)

3.  SAME—*Misrepresentations.*
    Misrepresentations, though in a slight degree, of material facts, relied upon by the vendee, will defeat specific performance in favor of the vendor. (p. 667.)

4. SAME.

> A court of equity will not specifically enforce an executory contract when it appears to be unfair, tainted with fraud or induced by misrepresentations. (p. 667.)

Appeal from Circuit Court, Barbour County.

Bill by S. A. Cleavenger and others against B. A. Sturm and others. Decree for plaintiff, and defendant Sturm appeals.

*Reversed.    Contract Rescinded.*

DENT & DENT, for appellant.

SAMUEL V. WOODS, for appellees.

SANDERS, JUDGE:

On the 15th day of December, 1902, a contract was entered into between Samuel A. Cleavenger and B. A. Sturm, whereby the former agreed to sell and convey to the latter 122 acres of land, with the exception of the coal underlying same which had been sold, and which was stated to be twenty-seven or twenty-eight acres, lying in Barbour county, for the sum of $8,075. At the time the contract was entered into, Sturm paid $100 on the cash payment. On the 17th day of December following Cleavenger made and tendered Sturm a deed conveying to him the property, which Sturm refused to accept, and at the January rules, 1903, S. A. Cleavenger and Mary Cleavenger, his mother, filed their bill in the circuit court of Barbour county, against Sturm and one Allen Moats, to compel specific execution of the contract, which is as follows:

"Dec. 15, 1902. Article of agreement between S. A. Cleavenger of the first part and B. A. Sturm of the second part *Witnesseth*, for and in consideration of Eight Thousand and Seventy-five Dollars, $8,075.00, the party of the first part agrees to sell and convey the said tract of land that he now owns to the party of the second part under a general warranty except the coal that has been sold, about twenty-seven or eight acres, further money in trust, which is held by the Mother of the party of the first part and in case she does not sign her right away to the party of the second part the party of the second part is to leave in bank what would be considered her third interest in said land and the above tract

contains 122 acres & the 5½ acres of land that the party of
the first part has rented of his mother and is to rent it to the
party of the second part just as he has it and when it comes
into his possession is to convey it to the party of the second
part at the same price per acre and the cash payment is to be
Twenty Hundred or more at the discretion of the party of
the second part and the residue in six and eighteen months at
six per cent interest from date of deed. Possession is to be-
gin on or before the 15th day of March, 1903."

After setting up in the bill the agreement, and the fact of
making and tendering the deed, and Sturm's refusal to ac-
cept same, the plaintiffs claimed that in the negotiations for
the purchase of the land Sturm stated that it was a joint pur-
chase for the benefit of himself and Allen Moats, his father-
in-law, and further represented that Moats was to sign the
notes for the deferred payments, and that his name should
have been signed to the contract, and that he would there-
after sign the same. To the bill Sturm and Moats filed
their separate answers, the latter denying that he had any
connection whatever with the contract, or that he had ever
authorized Sturm to represent that he would purchase the
land, and further denying that he authorized Sturm to sign
his name to any contract for the purchase of the land men-
tioned, or to any notes which might be given for the pur-
chase price thereof. In the answer filed by Sturm it is
claimed that as an inducement for him to enter into the con-
tract, Cleavenger represented that there were at least twenty
acres of the Pittsburg seam of coal on said land which had
never been sold, and that in addition the land was underlaid
with the Freeport seam of coal, and that upon an examina-
tion of the deed conveying the coal it would be found that
the matter was as stated, when, as found by Sturm on exam-
ination, made after the signing of the contract of purchase,
there had been conveyed by said deed all of the Pittsburg
seam of coal and all of the Freeport seam underlying the
Pittsburg seam, and that the deed conveying the coal also
contained the following provision: "It is expressly agreed and
understood that the parties of the first part further grant unto
the party of the second part the right of ingress and egress
under, over and through said tract of land for the purpose of
exploring, excavating, mining and removing said coal with

all the rights of drainage, air shafts, ventilation, and to go under and through said land for the purpose of removing other coal that may be owned and mined by the said party of the second part, or its successors and assigns from other tracts of land that may be operated and mined by him or them, and the said party of *of* the second part is released from all damage that may accrue to the surface of said land by reason of the removal of the said coal from under the same; and all other usual mining rights and privileges are hereby granted that may be required in the opinion of the party of the second part to carry on said mining operations and remove the coal aforesaid, but it is expressly understood that the right to bore for oil and gas is reserved by the parties of the first part, provided always that it shall not interfere with or cause damage or annoyance to the second party in its coal operations.'' It is claimed that Cleavenger said nothing in regard to these mining privileges and provisions of the deed when the contract was entered into. Sturm also denied that he had ever represented that Moats was interested in the purchase in question, and prayed for a rescission of the contract, and a decree against Cleavenger for the cash payment.

That the contract for the sale and conveyance was entered into and that Sturm paid $100 cash is not questioned, and inasmuch as the court below decreed only against Sturm, and not against Moats, and there being no cross-assignment of error, the contention that Moats was interested in the purchase is eliminated from the case.

The specific performance of the contract is resisted, and the recission thereof asked, on the ground that the plaintiff, Samuel A. Cleavenger, made certain misrepresentations, whereby the defendant Sturm was induced to sign the contract of purchase: It is charged that he represented to the defendant that there remained unsold upon the tract of land twenty or twenty-five acres of the Pittsburg vein of coal, and that the entire tract of land was underlaid with the Freeport vein of coal, none of which had been sold, and also that by the terms of the contract it was represented that in making the sale of the forty acres of coal underlying the land, only such mining rights and privileges were given as were necessarily implied by the grant, when, as a matter of

fact, all of the Pittsburg coal, and forty acres of the Freeport vein, had been sold and conveyed, and the mining rights and privileges granted by the deed conveying the forty acres of coal were greater than those which necessarily, by implication, would have followed the grant.

It appears that Cleavenger, on the 19th day of June, 1899, conveyed to James Irwin all the coal underlying forty acres of this tract of land, while the contract sought to be enforced represents that the coal had been sold under about twenty-seven or twenty-eight acres thereof. There is no representation by the terms of the contract as to the Pittsburg vein of coal, and the representations relied upon as to this coal are verbal statements claimed to have been made by Cleavenger before the contract of purchase was signed. The evidence as to what Cleavenger said in this regard is very conflicting and uncertain, but assuming that it shows what the defendant claims it does, still it would be insufficient to defeat specific performance, much less ground for rescission. These representations were matters of opinion. It is clear, from the evidence, that Cleavenger did not know, as a matter of fact, that there were twenty or twenty-five acres of the Pittsburg coal which had not been sold. He took Sturm upon this tract of land, showed him the outcrop of the coal, and pointed out the boundaries of the coal which had been sold. Sturm's opportunities for knowing whether or not twenty or twenty-five acres of the Pittsburg vein of coal remained unsold were as good as those of Cleavenger. He had the same information Cleavenger had, and was bound to know at the time of these statements that Cleavenger was giving them purely as a matter of opinion. "Where the representation *consists* of general commendations, or mere expressions of opinion, hope, expectation, and the like, and where it relates to matters which, from their nature, situation, or time, cannot be supposed to be within the knowledge or under the power of the party making the statement, the party to whom it is made is not justified in relying upon it and assuming it to be true; he is bound to make inquiry and examination for himself so as to ascertain the truth; and in the absence of evidence, it will be presumed that he has done so, and acted upon the result of his own inquiry and examination." Pom.

Eq. Jur., (3 Ed.), section 891. This being so, the defendant cannot be relieved from the contract upon this ground.

But the representations as to the Freeport vein of coal are different. The contract itself represents that the coal under about twenty-seven or twenty-eight acres of this tract of land had been sold, when, as a matter of fact, the plaintiff had sold and conveyed to Irwin, forty acres, making a difference of twelve or thirteen acres. This provision of the contract is a representation upon the part of Cleavenger that only twenty-seven or twenty-eight acres of this coal had been sold, which, at the time, he knew was untrue, because of his previous conveyance to Irwin. Having by the terms of his contract made this representation, which at the time he knew to be untrue, he cannot now be heard in a court of equity to demand specific performance of that contract, if these representations were material, and relied upon by the defendant, and he induced thereby to sign the contract. The evidence as to whether or not Cleavenger represented that his entire tract of land was underlaid with the Freeport vein of coal is somewhat conflicting, but the evidence that such representation was made clearly preponderates. The verbal testimony showing that Cleavenger represented that none of the Freeport vein of coal under this tract of land had been sold is sufficiently combatted by the terms of the contract itself, and by the statements which Cleavenger made, that he supposed that the deed conveyed all of the coal under the land which had been sold. But it appears that the entire tract is underlaid with the Freeport vein, and this being so, it is immaterial as to whether or not Cleavenger made verbal statements or representations as to this fact, because by the terms of his contract he sold to Sturm all the coal underlying the land, except as to the twenty-seven or twenty-eight acres which had been sold, when, as a matter of fact, the entire tract is underlaid with coal, and he having sold and conveyed forty acres instead of twenty-eight acres, which at the time of making the contract with Sturm he knew, and knowing, represented otherwise, would be a fraudulent misrepresentation. Furthermore, the provision of the contract reciting that twenty-seven or twenty-eight acres of coal had been conveyed, without referring to the mining rights and privileges contained in the deed of conveyance was a representation that

only such mining rights were granted by implication as were necessary for the removal of the coal. The defendant had the right to assume that this was so, and if at the time of the contract the plaintiff knew that he had conveyed away this property, and that in the deed of conveyance he had granted mining rights and privileges which did not impliedly follow the grant, it was his duty to make such facts known. The mining privileges which were granted in the deed to Irwin for the forty acres of coal are broad, and authorize the doing of many things which would not have been authorized and which could not have been done under a deed granting only the coal, with the necessary mining rights and privileges. A court of equity, where a false representation has been made as to a material matter, which has been relied upon by the purchaser, and he thereby induced to purchase, will not enforce specifically the contract, but will rescind it, if asked to do so. "A false representation of quantity of land, not relied on by the purchaser, and not operating to induce him to purchase, will give him no relief for deficiency; but when such false representation is proven, presumably it does so operate, unless it otherwise appear." *Cork* v. *Cook*, 56 W. Va. 51.

It is claimed, however, that Cleavenger invited Sturm to examine the record. It is shown that Sturm did not do so, but relied upon the representations of Cleavenger, which he had the right to do. It is true he could have examined the record, and ascertained the facts for himself, but not having done so, and relied upon the statements of his vendor, the latter cannot complain that he did not examine the record, but is bound by the representations which he made. JUDGE BRANNON, delivering the opinion of the Court in *Cork* v. *Cook*, *supra*, says: "I will not assert that if the complaining party simply have equal means to ascertain, he must make inquiry; but where a representation has been made, especially a known false one, it lies not in the mouth of the maker to say to the other that he should have made inquiry for himself, because he had right to rely on the representation." Kerr on Fraud, 79; *Hull* v. *Fields*, 76 Va. 607; *Wilson* v. *Carpenter*, 91 Va. 183. "It may be laid down as a general proposition that where the statements are of the first kind, and especially where they are concerning matters which, from

their nature or situation, may be assumed to be within the knowledge or under the power of the party making the representation, the party to whom it is made has a right to rely on them, he is justified in relying on them, and in the absence of any knowledge of his own, or of any facts which should arouse suspicion and cast doubt upon the truth of the statements, he is not bound to make inquiries and examination for himself. It does not, under such circumstances, lie in the mouth of the person asserting the fact to object or complain because the other took him at his word; if he claims that the other party was not misled, he is bound to show clearly that such party did know the real facts; the burden is on him of removing the presumption that such party relied and acted upon his statements." Pom. Eq. Jur., (3d Ed.), section 891; *Hull* v. *Fields, supra; Linhart* v. *Foreman's Admr.*, 77 Va. 540; *Rorer Iron Co.* v. *Trout*, 83 Va. 397; *Redgrave* v. *Hurd*, L. R. 20 Ch. Div. 1, 13, 14, *et seq.; Gammill* v. *Johnson*, 47 Ark. 335; *Bank of Woodland* v. *Hiatt*, 58 Cal. 234; *Dillman* v. *Nadlehoffer*, 119 Ill. 567. And again the same author says, in section 895: "Where a representation is made of facts which are or may be assumed to be within the knowledge of the party making it, the knowledge of the receiving party concerning the real facts, which shall prevent his relying on and being misled by it, must be clearly and conclusively established by the evidence. The *mere existence of opportunities for examination*, or of sources of information, is not sufficient, even though, by means of these opportunities and sources, in the absence of any representation at all, a constructive notice to the party would be inferred; the doctrine of constructive notice does not apply where there has been such a representation of fact. If one party—a vendor, for example—claims that the invalidating effects of his misrepresentations are obviated, and that the purchaser was not misled by them, either because they were concerning patent defects in the subject matter, or because he was from the outset acquainted with the real facts, or because he had made inquiry, and had thereby ascertained the truth, the foregoing qualification plainly applies; it is plainly incumbent on the vendor to prove the alleged knowledge of the purchaser by clear and positive evidence, and not to leave it a matter of mere inference or implication; *an*

*opportunity or means of obtaining the knowledge* is not enough.

We must not confound the principles which are to be applied where there is fraud or misrepresentation with those applicable to that class of cases where there is no fraud or misrepresentation, but where the vendor is unable to perform his contract in its entirety, because of a deficiency in the quantity or quality of the estate, or because of defect in his title or interest. In such cases equity may decree specific performance, with compensation or abatement for the deficiency or defect, if the vendor can substantially perform his contract. *Newman v. Kay,* 57 W. Va. 98; *Thompson v. Jackson,* 3 Rand. 504; 13 Ves. 73; Pomeroy's Eq. Jur., (Remedies), section 831.

Where, however, there is fraud or a misrepresentation which is material, and upon which the defendant relies in entering into the contract, a court of equity will not enforce the contract, but will rescind it. *Oil Co. v. Oil Co.,* 47 W. Va. 84; *Thompson v. Tod,* 1 Peters (U. S. C. C.), 380; *Boynton v. Hazelboom,* 96 Mass. 107; *Miller v. Chetwood et al.,* 2 N. J. Ch. 199. "An executory contract for the sale of land will not be specifically enforced where the written memorial describes the tract as containing 130 acres, when in fact it contained but 105 acres—the deficiency being supplied by the vendor by a subsequent purchase of 27 acres adjoining, but not within the boundaries of the tract as sold. The law will not compel a vendee either to pay for land he did not buy, or to accept a conveyance of 105 acres when he bought 130 acres." *Snedaker v. Moore,* 63 Ky. 542. Pomeroy, in his work on Equity Jurisprudence, classifies fraudulent misrepresentations under six different heads. The first is where a party makes a statement which is untrue, and has at the time an actual positive knowledge of its untruth, and the necessary resulting intent to deceive—the *scienter* at law. This is treated, in some respects, as the highest form of fraud, and is the classification which applies to the facts of this case. Here the representations, by the terms of the contract, were that only twenty-seven or twenty-eight acres of the coal had been sold, whereas, in truth and in fact, forty acres had been sold and conveyed. This is a positive statement upon the part of the vendor, which at the time he knew

to be untrue, having previously conveyed the same away. Also, by the terms of the contract, only the mining rights and privileges such as by law are incidental to and follow the grant of the coal are represented to have passed by the deed, whereas additional privileges were conveyed thereby. To call for specific performance, "The contract must be free from any fraud, misrepresentation even though not fraudulent, mistake or illegality." Pom. Eq. Jur., section 1405.

To entitle one to specific performance it must appear that he who seeks such relief, as a condition precedent thereto, has done or offered to do, and is ready, able and willing to do and perform all the material and essential acts required of him by the stipulations of his agreement, and unless he shows his willingness and ability to fulfil the contract upon his part, a court of equity will not require the other party to perform. Here it appears that Cleavenger is unable to perform the contract. Having conveyed away forty acres of coal, while his contract represented that he had conveyed only twenty-seven or twenty-eight acres, and also having conveyed certain mining privileges not implied by the grant, and it not being within his power to perform, equity and good conscience will not require of the defendant a performance on his part. "The maxim 'he who seeks equity must do equity' is uniformly applicable in actions for specific performance. This rule, it has been said, requires of the plaintiff that he do all that is in his power to fulfill his part of the contract which he is seeking to enforce; according to its terms. He must do his full duty or the court will not regard his prayer." 26 Am. & Eng. Ency. Law (2d Ed.), 44; *Boone* v. *Missouri Iron Co.*, 17 How., (U. S.) 340; *Colson* v. *Thompson*, 2 Wheat., (U. S.) 336; *Morgan* v. *Morgan*, 2 Wheat. (U. S.) 290; *Harvie* v. *Banks*, 1 Rand. 408; *Cohn* v. *Mitchell*, 115 Ill. 124; *Wiengaertner* v. *Pabst*, 115 Ill. 412.

However, the representations made must have been relied upon by the purchaser, and in concluding whether or not this is so, we must look to the character of the representations, and to all the facts and circumstances surrounding the case. These representations go to the very substance of the contract, and, from the whole case, we conclude that they were relied upon by Sturm in entering into it.

Then, again, not only must this be so, but the representa-

tions must be material. But where fraudulent misrepresentations are shown to have been made, and where they have been acted upon by the purchaser and he induced thereby to sign the contract, it will be sufficient to refuse performance and to rescind the contract, if the prejudice is only slight. "The court, however, does not inquire with any care into the extent of the prejudice; it is sufficient if the party who has been misled is very slightly prejudiced, if the amount is at all appreciable." Pomeroy's Contracts (Specific Performance) section 227. And the same author says, in section 228: "If a representation, upon which an agreement has been entered into, is not only untrue but fraudulent, or if it contains any element of knowledge or intention, it forms a complete defense to the enforcement of the whole contract. The party who made it will not be allowed, against the objection of the other party, to waive the particular part of the contract to which the false statement relates, or with which it is concerned, and to obtain a specific performance of the remainder. * * * A representation, as we have seen, may prevent the specific enforcement of an agreement by a court of equity, although it was not intentionally false, although the party making it was innocent of any deception, and believed his statement to be true." *Viscount Clermont* v. *Tasburgh*, 1 J. & W. 112. *Cadman* v. *Horner*, 18 Ves., Jr., 9: "Misrepresentation, though in a slight degree, is an objection to specific performance."

Pomeroy's Eq. Jur., section 898, in treating of the materiality of the representation, says: "If any pecuniary loss is shown to have resulted, the court will not inquire into the extent of the injury; it is sufficient if the party misled has been very slightly prejudiced, if the amount is at all appreciable." *Smith* v. *Kay*, 7 H. L. Cas. 750.

For the foregoing reasons, we reverse the decree of the circuit court, rescind the contract, and give decree in favor of Sturm for the cash payment made by him, with interest.

*Reversed. Contract Rescinded.*